GRIFFITH MOTORS, INC.,
Plaintiff-Appellant,

v.

C. E. PARKER, Billy J. Stewart, James S. Shorter and James Carden, Jr., individually and d/b/a Parker, Stewart & Shorter, a partnership, Defendants-Appellees.

Court of Appeals of Tennessee,
Eastern Section.

Jan. 12, 1982.

Application for Permission to Appeal
Denied by Supreme Court
April 12, 1982.

**320**

John W. Emerson, Richard W. Pectol, Johnson City, for plaintiff-appellant.

Joel M. Leeman, Nashville, Thomas C. McKee, Johnson City, for defendants-appellees.

## OPINION

GODDARD, Judge.

The complaint of Griffith Motors, Inc., Plaintiff-Appellant, against C. E. Parker and others individually and as an accounting partnership, Defendants-Appellees, was dismissed by summary judgment. Griffith insists there are material disputed facts as to its theory of breach of contract as well as tort, and consequently the Trial Court's dismissal was erroneous.

The complaint, which is couched in language partaking of both breach of contract and tort, contends that representatives of the Defendant partnership failed to advise the proper officials of Griffith Motors that one of its employees was guilty of a number of acts of malfeasance, including false and fictitious bookkeeping entries to cover up sales of automobiles out of trust, and ultimately in a check kiting scheme. Griffith contends that these facts were known, or by the exercise of reasonable care should have been known, by the Defendants, and that their failure to impart the information to James M. Allen, president and sole stockholder of Griffith, resulted in damage to Griffith.

The Trial Court sustained the motion for summary judgment on two grounds: First, he concluded that because the Plaintiff did not contend the Defendants were guilty of any fraudulent acts the cause of action must stand, if at all, upon the contract theory. He thereupon found there was no genuine issue of fact as to the scope of the Defendants' engagement which did not embrace responsibility for the learning of the employee's misfeasance. As a second ground for dismissal he found that the errant employee's knowledge of his own transgressions was imputable to Griffith and, consequently, Griffith was not in a position to cast liability upon the Defendants for failing to learn and advise it of matters which in law it was deemed to know.

Griffiths' appeal contends there is a genuine issue of fact as to the first issue, and that the Court misapplied the rule of law as to the second.

Before discussing the proof, it is well to remember the guidelines given by the Supreme Court when dealing with summary judgments. Two Supreme Court cases are instructive. In the first, *Evco Corporation v. Ross*, 528 S.W.2d 20, 24 (1975), Mr. Justice Harbison states:

> Summary judgment proceedings in this state were authorized for the first time by Rule 56 of the Tennessee Rules of Civil Procedure. This new procedure was designed to fill a vacancy or void which had existed in prior practice and to provide a procedural step which had heretofore not existed. Under previous practice, in both the circuit and chancery courts, there had been no satisfactory intermediate step between the demurrer, which dealt only with the contents of pleadings, and a full-scale trial of a case upon the merits. The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

In a later case, *Bowman v. Henard*, 547 S.W.2d 527, 530 (1977), Mr. Justice Henry makes the following observation:

> As a *general rule* summary judgments are not appropriate in negligence cases. See Wright & Miller, Federal Practice and Procedure: Civil Sec. 2729. We particularly consider them inappropriate, as a *general rule*, in malpractice actions against professionals, recognizing, as we must, the natural tendency of their colleagues to be good Samaritans and come to their rescue in a time of distress. We, of course, do not restrict this view to men of medicine. (Emphasis in original.)

■ There is proof that Jerry D. Jones, who was the business or office manager and secretary and member of the Board of Directors of Griffith from January 1, 1973 through November of 1978, perpetrated a check kiting scheme with company funds and falsified its books and records from which it may be inferred that he misappropriated its funds. The Defendant C. E. Parker, who was the personal accountant for Mr. Allen before acquisition of the motor company, handled practically all of the accounting for Mr. Allen personally, as well as for any firm in which he had an interest.[1] There was never any formal or written contract for the accounting services. There is proof that the Defendant accounting firm was employed to do what has been described as a "straight audit" for the motor company. Straight audit was defined by Mr. Allen as when the accounting firm comes in and "generally takes a look at the important functions of the dealer," looking at the cash and at postings, and generally "taking a look at the books." This testimony, coupled with past practices where Mr. Parker had "critiqued the quality and performance of . . . accounting personnel and accounting procedures" and Mr. Allen's answer to an interrogatory wherein he states that the Defendant was employed "to perform accounting or public accounting procedures for the company, to assist and evaluate the bookkeeping personnel in the office and to accurately report to the President and sole Stockholder of the company the company's true financial condition" are sufficient in our view to raise a question of fact regarding the terms of the Defendants' engagement, notwithstanding the considerable mass of evidence that the contract contemplated only preparation of income tax returns which, according to experts on behalf of the Defendants, entitled the accountant to rely exclusively upon the information furnished by the client.

But even should we accept the Defendants' contention that the contract was merely for preparation of income tax returns, there is disputed proof as to whether the accountant should have sought additional information upon Mr. Jones' insistence that a year-end adjustment in 1977 of $326,000 was proper, especially when this sum is compared to none or relatively modest ones in most all of the prior years. As to this point, Frank A. Borschke, a certified public accountant of Troy, Michigan, testified by affidavit as follows:

> If I, or any member of my firm, acting under our standard tax procedures, had obtained a trial balance from the source accounting records of Griffith Motors, Inc. in connection with preparing an annual tax return which showed a credit balance (overdraft) in the cash in bank account in the amount of $306,124.55 for year ending December 31, 1977, I would not have made adjusting journal entries in the amount of $326,550.50 debit for December 31, 1977 simply on the basis of a request by the office manager without (a) verifying the reasons or basis for the adjusting journal entries, and (b) calling these large differences to the attention of the owner of the business or next highest level management officer.

Ronald Jack Russell, licensed public accountant and current office manager of Griffith, testified in a similar vein, and in addition that the acts on the part of the

---

1. During the period from January 1973 to November 1978, various personnel of the accounting firm handled the Griffith account.

Defendants were negligence and inconsistent with standards of public accountings in East Tennessee.

We thus conclude there is a dispute of fact relative to the scope of the contract as well as to the duties of an accountant, even if the contract is as contended by the Defendants.

Before leaving this issue, we have not overlooked the proof that a large adjustment is not unusual when a computer is utilized as to certain of the data. However, we believe reasonable minds could differ as to whether the accountant's duty required further investigation or notice to Mr. Allen.

■ The rule of law supporting the second ground relied upon by the Trial Court is found in Fletcher's Cyclopedia of Corporations, § 790, and charges a corporation with "constructive knowledge regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of authority, even though the officer or agent does not in fact communicate his knowledge to the corporation." The rule is based either upon the fiction of identity of principal and agent or the presumption that an agent has done his duty and communicated his knowledge to the corporation. There is an exception to this rule, however, where the agent is dealing with the principal in his own interests or where his interests are adverse to that of the principal so that it is to his own advantage not to impart his knowledge to the principal. Section 819. There is also a limitation to this exception, sometimes referred to as the "sole actor" or the "sole representative" doctrine. Section 827. This doctrine holds that the adverse interest exception does not apply when the transaction on behalf of the principal to which notice is sought to be imputed is entrusted solely to the officer or agent having the knowledge. The rationale behind this doctrine is that the agent is necessarily acting for the principal in his official capacity and as its sole authorized agent; hence, his knowledge must be imputed to the principal. Tennessee cases—

although not always clearly articulating the rule, the exception and the limitation on the exception—appear to be in accord. *Jackson v. American Eagle Fire Ins. Co.,* 92 S.W.2d 874 (Tenn.1936); *Barry v. Hensley,* 170 Tenn. 598, 98 S.W.2d 102 (1936); *Freeman v. Citizens' National Bank,* 167 Tenn. 399, 70 S.W.2d 25 (1934); *People's Bank & Trust Co. v. Potter,* 156 Tenn. 649, 4 S.W.2d 341 (1928); *Smith v. Mercantile Bank,* 132 Tenn. 147, 177 S.W. 72 (1915); *Wood v. Green,* 131 Tenn. 583, 175 S.W. 1139 (1914); *Merchants' & Planters' Bank v. Penland,* 101 Tenn. 445, 47 S.W. 693 (1898); *State ex rel. Clarke v. Ripley Savings Bank & Trust Company,* 25 Tenn.App. 490, 160 S.W.2d 189 (1941).

A typical factual situation giving rise to consideration of the doctrine is set out in *National Bank of Commerce v. Feeney,* 9 S.D. 550, 70 N.W. 874 (1897). In that case a Mr. Ewert was affiliated with the firm of Clough, Ledwick & Co., and was also cashier of the plaintiff bank. In defending a suit for collection of certain notes payable to the firm and discounted at the bank, the defendant insisted the knowledge of Ewert was imputable to the bank. In disposing of the matter the Court stated (at page 875):

The defendant further contends that, if the notes were negotiable, the plaintiff took them subject to any defenses, for the reason that one Adolph Ewert, who was one of the firm of Clough, Ledwick & Co., was also cashier of the plaintiff bank at the time the notes were transferred to the bank; that Ewert as a member of the firm, was charged with knowledge of all defenses to the notes, and, as cashier of the bank, his knowledge as a co-partner was chargeable to the bank. That he was a member of the firm of Clough, Ledwick & Co., and also cashier of the bank, is not disputed; but it was shown by undisputed evidence that, in discounting the notes, Ewert acted for his firm, and did not act as the cashier of the bank. The bank, in discounting the notes, acted entirely through its discount committee, of which Mr. Ewert was not a member. The plaintiff therefore contends that, under such a

state of facts, the knowledge of the cashier is not imputed to the bank, and that the case does not come within the rule laid down in *Bank v. Kellogg*, 4 S.D. 312, 56 N.W. 1071; *Stebbins v. Lardner*, 2 S.D. 127, 48 N.W. 847; *Farmers' & Traders' Bank v. Kimball Milling Co.*, 1 S.D. 388, 47 N.W. 402. The authorities recognize a marked distinction between cases where a cashier not only acts for himself, but also as such cashier, and cases where the person, though cashier, acts for himself only, or for a firm of which he is a member, and the corporation is represented in the transaction by other officers. In the latter cases the knowledge of the cashier is not imputed to the bank. The law upon this subject is thus stated in the late case of *Bank v. Lovitt*, 114 Mo. 519, 21 S.W. 825.

■ Applying the foregoing rules to the case at bar, it is not clear that the miscreant agent's acts could be termed a transaction and subject to the sole-actor doctrine. It seems to us the rule contemplates transacting a piece of business involving at least two parties where the agent is acting on his own behalf or for a third party on the one hand and for the employer on the other. We do not believe that it was intended to apply where an officer misappropriates a corporation's money. By way of analogy, we do not believe it could be said, and as we understand the Defendants' brief they do not insist, that the rule would be applicable to exonerate them had they been employed to perform a defalcation audit to discover an embezzling employee. We thus conclude that the sole-actor doctrine is not applicable to the factual situation in this case.

In addition to the grounds relied upon by the Trial Judge, the Defendants insist that a summary judgment was proper because under the undisputed facts Griffith has not been damaged. The Trial Court rejected this insistence, and in light of Mr. Allen's affidavit regarding additional income tax liability, and overdrafts accumulating, we believe the Trial Court acted properly.

For the foregoing reasons the case is reversed and remanded for trial. The costs of appeal are adjudged against the Defendants.

SANDERS and FRANKS, JJ., concur.